UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:17-CV-439-DJH

GGNSC LOUISVILLE HILLCREEK, LLC,
d/b/a GOLDEN LIVING CENTER – HILLCREEK;
GGNSC ADMINISTRATIVE SERVICES, LLC; and
GGNSC CLINICAL SERVICES, LLC                                    PETITIONERS

v.

ESTATE OF ROBERT C. BRAMER, BY AND THROUGH
MARGARET A. BRAMER, AS ADMINISTRATRIX; and
MARGARET A. BRAMER, INDIVIDUALLY,                              RESPONDENTS

**RESPONDENTS' MEMORANDUM RESPONSE IN OPPOSITION TO
PETITIONERS' MOTION TO PROCEED WITH SUMMARY CONSIDERATION
OF THE ENFORCEABILITY OF JANUARY 26, 2015 ALTERNATIVE DISPUTE
RESOLUTION AGREEMENT AND TO COMPEL ARBITRATION
AND REQUEST FOR HEARING**

Respondents, Estate of Robert C. Bramer, by and through Margaret A. Bramer, as

Administratrix, and Margaret A. Bramer, Individually, by counsel, and for their Response in

Opposition to Petitioners' Motion to Proceed with Summary Consideration of the Enforceability

of January 26, 2015 Alternative Dispute Resolution Agreement and to Compel Arbitration and

Request for Hearing, state as follows:

### INTRODUCTION

On July 14, 2016, Robert Bramer sustained a serious fall due to the negligence of

Petitioners, resulting in a fatal head injury.  Now, Petitioners go out of their way to force Mr.

Bramer's widow to give up her and her husband's constitutional rights to have their case heard

by a jury, and instead force them to binding arbitration even though there is no signed arbitration

agreement for the residency in question.  This matter has already been exhaustively briefed,[1] but

---

[1] (See DN 1, Petition to Compel Arbitration and Related Relief; DN 3, Petitioners' Motion for Expedited
Consideration of the Enforceability of the Alternative Dispute Resolution Agreement and to Compel Arbitration;

1

Petitioners have now filed yet another Motion to Compel Arbitration on the enforceability of an arbitration contract that was not in effect at the time of the residency that is the subject of Respondents' State Court Action.  For 39 pages, Petitioners discuss how an arbitration contract signed by Ms. Bramer almost 18 months before the residency in question should apply.  Yet, Petitioners' reliance on the January 26, 2015 arbitration contract, much like its previous reliance on the January 5, 2015 arbitration contract,[2] is another red herring meant to distract the Court from the fact that no signed arbitration contract exists for the July 13, 2016 admission.

Petitioners admitted Mr. Bramer on three separate occasions to their facility.  Ms. Bramer filed suit regarding the negligence committed by the Petitioners during the third admission that resulted in her husband's death.  It is undisputed that Petitioners have not and cannot produce a signed arbitration contract for this admission.  Recognizing this, Petitioners initially argued to this Court that an arbitration contract signed for the first admission should apply to the third admission.  The parties fully briefed this issue.[3]  Then, apparently recognizing the futility of this argument, Petitioners filed another Motion to Compel based on an arbitration contract for the second admission, arguing that it should apply.  (See DN 19.)

DN 11 and 11-1, Respondents' Motion to Dismiss Petitioners' Petition to Compel Arbitration and for Related Relief Pursuant to Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction, Fed. R. Civ. P. 12(b)(7) for Failure to Join a Party Under Fed. R. Civ. P. 19, and Fed. R. Civ P. 12(b)(6) for Failure to State a Claim Upon Which Relief May Be Granted; DN 12, Respondents' Response in Opposition to Petitioners' Motion for Expedited Consideration of the Enforceability of the Alternative Dispute Resolution Agreement and to Compel Arbitration; DN 13 and 13-1, Petitioners' Motion for Leave to File Amended Petition to Compel Arbitration and for Related Relief and Amended Petition to Compel Arbitration and for Related Relief; DN 15, Petitioners' Consolidated Response in Opposition to Respondents' Motion to Dismiss Petitioners' Petition to Compel Arbitration and for Related Relief and Reply in Further Support of Petitioners' Motion for Expedited Consideration of the Enforceability of the Alternative Dispute Resolution Agreement and to Compel Arbitration; and DN 17, Respondents' Reply in Support of Motion to Dismiss Petitioners' Petition to Compel Arbitration and for Related Relief.)

[2] As this Court is aware, Petitioners initially relied on the January 5, 2015 arbitration agreement in their original Petition to Compel Arbitration and for Related Relief and Motion for Expedited Consideration of the Enforceability of the Alternative Dispute Resolution Agreement and Compel Arbitration.  (See DNs 1 and 3, respectively.)  Respondents have consistently challenged the validity of the signature on the January 5, 2015 as not being Mr. Bramer's.  Respondents provided an affidavit from Ms. Bramer and expert report confirming that the signature on the purported arbitration contract is not Mr. Bramer's.  (See DN 11-2 and DN 17-4.)  It is unclear if Petitioners have dropped their Motion to enforce the forged contract or if they are still seeking for this Court to enforce two separate arbitration agreements, neither of which apply to the subject residency.

[3] (See fn 1.)

2

Regardless of the many attempts Petitioners are making, the bottom line is that no signed arbitration agreement exists for the third admission and this case should proceed in state court in front of a jury.  Ms. Bramer originally filed the underlying action on June 28, 2017 in Jefferson Circuit Court and it has set in limbo for almost six months while Petitioners filed this federal action and continue to file one motion to compel after the other, coming up with new, but meritless arguments.

Specifically, Petitioners have failed to meet their *prima facie* burden of producing a valid arbitration contract because no signed arbitration contract exists for the July 13, 2016 admission.  Petitioners' attempts to bootstrap the previous January 2015 purported contracts to the July 13, 2016 admission are unavailing because they do not apply and even if they did they are not valid.  First, a contract from an admission 18 months earlier has no binding effect for three reasons:  (1) Kentucky law disfavors contracts in perpetuity; (2) the July 13, 2016 admission is not a covered dispute under the January 2015 arbitration contracts; and/or (3) the parties abandoned any previous arbitration contracts, even if valid, through their conduct.  Second, assuming, arguendo, that the contract from the second admission does apply to Mr. Bramer's third admission, the contract is not valid because Ms. Bramer did not sign in a representative capacity and did not have the authority to bind her husband to arbitration.  Additionally, if the Court does determine that the Respondents' claims are subject to arbitration, which Respondents deny, the Court should not stay Respondents' wrongful death and loss of consortium claims, which were properly brought in state court.

## FACTUAL BACKGROUND

Given this is Petitioners' **second** Motion to Compel Arbitration, as well as the exhaustive briefing to date in this matter, Respondents incorporate by reference their fact sections from previous briefs. (<u>See</u> DN 11-1, p. 3-5; DN 17, p. 1-3.)

## PROCEDURAL CASE BACKGROUND

On June 28, 2017, Respondents filed suit against Petitioners, related entities, and the facility administrator in Kentucky state court for claims of negligence, negligence *per se*, corporate negligence, medical negligence, violations of the Kentucky Residents' Rights Act, wrongful death, and loss of consortium related to the July 13, 2016 admission of Mr. Bramer to Petitioners' Hillcreek facility (hereinafter, "Third Admission"). (<u>See</u> DN 1, p. 11-39.) Petitioners subsequently instituted the present action in federal court by intentionally failing to name the administrator in order to create diversity. (<u>See</u> DN 1.) Petitioners originally sought to compel arbitration only based on an arbitration contract related to an admission on January 5, 2015 (hereinafter, "First Admission") and purportedly signed by Mr. Bramer. (<u>See</u> DN 1, 3.) Respondents subsequently filed their Motion to Dismiss and Response in Opposition to Petitioners' Petition to Compel Arbitration because, among other reasons, the signature on the arbitration contract for the First Admission was not Mr. Bramer's signature, and because no arbitration contract exists relating to the July 13, 2016 admission that is the subject of Respondents' State Court Action. (<u>See</u> DN 11, 11-1, and 12.)

After receiving Respondents' Motion to Dismiss, on October 2, 2017, Petitioners filed a Motion to Amend their Petition to Compel Arbitration and Consolidated Response to Respondents' Motion to Dismiss and Reply in Support of their Petition to Compel Arbitration, arguing, for the first time, that an arbitration contract purportedly signed by Ms. Bramer in her

representative capacity related to the January 26, 2015 admission (hereinafter, "Second Admission") applied to the Third Admission in order to compel arbitration. (See DN 13, 13-1, and 15.) Petitioners argued at that time that the Court should compel arbitration based upon both the contract from the First Admission and the contract from the Second Admission. (Id.) After Respondents filed their Reply in Support of their Motion to Dismiss, Petitioners changed their argument yet again by filing a **second** Motion to Compel Arbitration, asking this Court to focus only on the arbitration contract from the Second Admission. (See DN 19, 19-1.) Despite Petitioners' changing argument as to the contract they seek to enforce, neither the contract from the First Admission nor the Second Admission apply to compel Respondents to arbitrate claims, which relate solely to the Third Admission. Respondents therefore respectfully request that the Court deny both of Petitioners' Motions to Compel Arbitration.

## ARGUMENT[4]

I.     **It is Undisputed that No Arbitration Contract Exists for the Third Admission and Therefore Petitioners Cannot Satisfy their Burden of Producing a Valid Arbitration Agreement.**

It is undisputed that no arbitration contract exists for Mr. Bramer's Third Admission. In order to compel arbitration, Petitioners are required to show that a **written and signed** arbitration agreement exists for the subject admission. MHC Kenworth-Knoxville/Nashville v. M & H Trucking, LLC, 392 S.W.3d 903, 906 (Ky. 2013). Petitioners have not met and cannot meet this burden. "The party who raises an arbitration agreement as a bar to court proceedings bears the burden of showing a valid arbitration agreement exists." GGNSC Stanford, LLC v. Rowe, 388 S.W.3d 117 (Ky. App. 2012) (citing Mt. Holly Nursing Center v. Crowdus, 281 S.W.3d 809, 813 (Ky. App. 2008)). "[T]he existence of a valid arbitration agreement as a

---

[4] Respondents incorporate herein their Motion to Dismiss (DN 11 and 11-1), Response in Opposition to Petitioners' Motion to Compel Arbitration (DN 12), and Reply in Support of Motion to Dismiss (DN 7).

threshold matter must first be resolved by the court.  The court must determine whether an arbitration agreement is valid, enforceable, and irrevocable, based upon such grounds as exist at law for the revocation of any contract." Mt. Holly Nursing Center, 281 S.W.3d at 813 (internal citations omitted).

Petitioners have not met their burden of producing a written and signed arbitration contract because the arbitration contract for the July 13, 2016 admission is not signed.  (See DN 17-2 and below).  Neither Mr. Bramer nor Ms. Bramer signed the contract.  (See id.)

**THIS AGREEMENT GOVERNS IMPORTANT LEGAL RIGHTS.
PLEASE READ IT CAREFULLY AND IN ITS ENTIRETY BEFORE SIGNING.**

_Robert Bramer_
Print Name of Resident

_Odele -Hillcreek -GL_
Print Name and Number of LivingCenter

_____     _____
Signature of Resident                                                    Date

By my signature, I acknowledge that I have read this Agreement or had it read to me, that I understand what I am signing, and that I accept its terms.

Signature on behalf of LivingCenter:  I, _Colleen Sprinkle_ (name of LivingCenter witness), do hereby sign this Agreement on behalf of LivingCenter. By my signature, I hereby attest that (1) before Resident and/or Resident's representative signed this document I offered the signer(s) the opportunity to read it in full, or to have it read to him/her in full; (2) I saw the signature of the resident, or of the person signing on behalf of the Resident, written upon this document.

_____     _____
Signature of Resident's Legal Representative          Print Name of Legal Representative

By my signature, I represent that I am a person duly authorized by Resident or by law to execute this Agreement and that I accept its terms.

_Spouse_
Specify Capacity of Legal Representative (e.g., Power of Attorney, Agent, Next of Kin)

_3920 Chatham Rd Lou/by_ 40218   502.459-1494
Address                                              OR                          Phone

Despite clear evidence that the Bramers **did not** agree to arbitrate regarding the July 13, 2016 admission, Petitioners argue that they can meet their initial burden by producing **any** signed arbitration contract from any admission.  Yet, the meaning of _prima facie_ evidence is that which is sufficient, at first appearance, to raise a presumption.  (See _Prima Facie_, Black's Law Dictionary.)  Here, the arbitration contracts from the First and Second Admissions, although

6

signed,[5] are dated more than 18 months prior to the admission in question, and do not, at first appearance, raise a presumption of arbitration, particularly where the arbitration contract for the admission in question is unsigned.  To argue otherwise undermines basic contract principals of offer, acceptance, and mutual assent.[6]  These basic contract principals are equally applicable to arbitration contracts as they are to any other contract.    See Rowe, 388 S.W.3d at 121.[7] Therefore, Petitioners have not met their burden in showing the existence of a valid arbitration contract.  Instead, the burden remains on Petitioners to show that either the January 5, 2015 or January 26, 2015 arbitration contracts are valid and apply to compel the parties to arbitrate Respondents' claims related to the July 13, 2016 admission.  Petitioners, as explained below and in Respondents previous pleadings, have not met this burden.

## II.     The Purported Arbitration Contract from the Second Admission Does Not Apply to Mr. Bramer's Third Admission.

Even assuming, arguendo, that Petitioners have met their burden of producing a valid arbitration contract, the arbitration contract from the Second Admission does not apply to Mr. Bramer's Third Admission.  Specifically, the Third Admission is not a covered dispute under the Second Arbitration Agreement.  Alternatively, the parties abandoned any previous arbitration contracts when Petitioners presented Ms. Bramer with yet another arbitration contract for the

---

[5] Respondents dispute that Mr. Bramer signed the purported contract for the First Admission.  (See DN 12, p. 5-7; DN 17, p. 12-15.)  As to the purported contract for the Second Admission, Respondents dispute its applicability and validity herein.

[6] Respondents address the lack of mutual assent in the unsigned July 13, 2016 contract in their Response in Opposition to Petitioners' Petition to Compel Arbitration.  (See DN 12, p. 4-5.)

[7] While Respondents acknowledge that the purpose of the Federal Arbitration Act ("FAA") is to enforce valid arbitration agreements and place arbitration agreements on equal footing as other contracts, see AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 344 (U.S. 2011), case law has instead in effect placed arbitration agreements *above* other contracts.  For example, were this any other contract, Petitioners would be required to prove the existence of the agreement with clear and convincing evidence.  See Quadrille Bus. Sys. v. Ky. Cattleman's Ass'n, 242 S.W.3d 359, 364 (internal quotations omitted) (*holding* that a plaintiff seeking to enforce an agreement must show that an agreement existed between the parties with clear and convincing evidence).  Instead, because this dispute involves an arbitration contract, Petitioners' burden is substantially less.  Even though it is substantially less, however, does not mean the burden is nonexistent.  Petitioners still have to put forth a *prima facie* case, which they have failed to do.

Third Admission, and Ms. Bramer declined to sign the contract. Accordingly, Petitioners' Motion to Compel Arbitration should be denied because no arbitration contract applies to Mr. Bramer's Third Admission.

### A. The Arbitration Contract for the Second Admission Does Not Encompass Respondents' State Court Action Regarding the Third Admission.

Petitioners claim that the arbitration contract from the Second Admission should be interpreted to cover Mr. Bramer's Third Admission. That interpretation of the arbitration contract, however, runs afoul of Kentucky's strong disfavor for contracts in perpetuity." See Electric & Water Plant Bd. v. South Cent. Bell Tell. Co., 8005 S.W.2d 141 (Ky. App. 1990). "Kentucky law does not favor contracts running into perpetuity. The rule in this state is that if a contract covers no definite period, it may be terminated by either party at will." Id. at 143. Constructions conferring a right in perpetuity are void. Id. The arbitration contract from the Second Admission attempts to avoid Kentucky's disfavor of contracts running into perpetuity with a clause stating that the agreement to arbitrate "remain[s] in effect for all care and services rendered to the Resident at or by the Facility regardless of whether the Resident is subsequently discharged and readmitted."[8] Mr. Bramer's Third Admission, however, is not a covered dispute under the definitions of the January 26, 2015 arbitration contract.

The arbitration contract only covers three types of disputes:  1) disputes related to the arbitration agreement itself; 2) disputes related to the resident's stay at the facility; and 3) disputes related to the Admissions Agreement.  (See DN 13-4, p.3.)  Here, Respondents filed a State Court Action related to negligence, wrongful death, and loss of consortium regarding a different stay.  This has nothing to do with any dispute related to the arbitration agreement itself

---

[8] Petitioners claim that Kentucky's disfavor of perpetual contracts applies only to performance in perpetuity and not structural provisions.  (See DN 19-1, p. 38, fn. 24.)  Petitioners, however, cite to no case law in support of this allegation.

or the Admissions Agreement.  (See DN 11-2, p. 49-54.)  The State Court Action dispute is only related to Mr. Bramer's stay at the facility in July 2016.  The issue is the meaning of "resident's stay."

Importantly, the clause in question uses the singular when describing "stay."  The plain meaning of stay is the Second Admission as referenced in the Admission Agreement.[9]  No reference is made to any other stays at the facility. "Where language has a generally prevailing meaning, it is interpreted in accordance with that meaning."  Restatement (Second) of Contracts, § 202(3)(a).  Contract terms are to be given their ordinary meaning.  Frear v. P.T.A. Indus., 103 S.W.3d 99, 106 (Ky. 2003).  The word stay means "[a] period of staying somewhere, in particular of living somewhere temporarily as a visitor or guest.  (See Stay, Oxford Dictionary.)

Petitioners' argument that the clause requiring perpetuity covers any subsequent admissions to the facility is not persuasive, and is not consistent with the contract itself or the parties' conduct.  When taken with the definition of a "covered dispute," this clause only means that the parties have agreed to arbitrate claims related to that specific and singular stay.  For example, if a resident is admitted during "Stay One" and signs an arbitration contract electing for arbitration, then any claims related to "Stay One" are arbitrable.  If, however, the resident is later admitted for "Stay Two" and signs the arbitration contract declining arbitration, any claims related to "Stay Two" are not arbitrable.  The arbitration contract related to "Stay One" remains in effect, but only as to claims related to "Stay One."  This meaning of the arbitration contract is consistent with Petitioners own conduct in presenting new arbitration agreements at each subsequent admission.[10]  Petitioners' interpretation of the arbitration contract reads a meaning

---

[9] The arbitration contract and Admission Agreement for the Second Admission must be read together because upon execution, the arbitration contract is incorporated into the Admission Agreement.  (See DN 13-4, p.2.)

[10] See § B below for discussion regarding Petitioners' conduct related to the arbitration contracts.

into the contract that simply does not exist -- stay is singular.  Respondents therefore respectfully request that Petitioners' Motion to Compel Arbitration be denied.

### B. The Parties Abandoned Any Previous Arbitration Contracts When GGNSC Presented Margaret Bramer with Another Arbitration Contract at the Third Admission.[11]

Petitioners cannot enforce arbitration contracts for either the First Admission or Second Admission, even if, arguendo, the Third Admission is a covered dispute, because the arbitration contracts were abandoned by the parties' subsequent conduct.  "A contract may be rescinded or discharged by acts or conduct of the parties inconsistent with the continued existence of the contract, and mutual assent to abandon a contract may be inferred from the attendant circumstances and conduct of the parties."  <u>Texaco,</u> 444 S.W.2d at 263 (*quoting* 17 Am.Jur.2d, Contracts, § 494).  Here, the January 5, 2015 and January 26, 2015 arbitration contracts were abandoned by the attendant circumstances and conduct of the parties.

In <u>Texaco</u>, the Kentucky Court of Appeals determined that there was sufficient evidence to support a jury verdict that an equipment lease containing an exoneration clause was abandoned by the parties.  <u>Id.</u> at 263.  The lease required that the customer keep the leased equipment in "good order and repair" at his own expense.  <u>Id.</u> at 262-263.  Evidence was presented, however, that the customer was instructed not to undertake any repair or maintenance of the equipment, and that such repairs and maintenance would be undertaken and paid for by Texaco.  <u>Id.</u> at 263.  The court held that this conduct, which was contrary to the terms of the

---

[11]Petitioners spend six pages arguing that there has not been a novation of the arbitration contract.  (<u>See</u> DN 19-1, p. 32-37.)  Respondents do not disagree, and have never argued that there has been a novation of the argument. Respondents will therefore not waste this Court's time in addressing this argument.  Instead, Respondents previously argued, and continue to argue, that the previous agreements were abandoned as evidenced by party conduct. Abandonment of a contract is a separate and distinct contract defense with distinct elements.  *Compare* <u>Texaco, Inc. v. Debusk</u>, 444 S.W.2d 261 (Ky. App. 1969) (outlining elements of abandonment of a contract) with <u>White/Reach Brannon R.D., LLC v. Rite Aid of Ky., Inc.</u>, 488 S.W.3d 631 (Ky. App. 2016) (outlining elements of novation).

equipment lease, was sufficient to support the jury's determination that the lease was abandoned by the parties. Id.

Here, the January 5, 2015 and January 25, 2015 ADR contracts were rescinded and abandoned by the parties as evidenced by party conduct. Not once – but two more times – Hillcreek presented new ADR contracts. For the July 13, 2016 admission, Hillcreek provided Ms. Bramer with a letter instructing her to sign the documents where highlighted.[12] Hillcreek's conduct of providing subsequent ADR contracts not once, but twice, is wholly inconsistent with its argument of the continued effectiveness of the purported January 5, 2015 contract into perpetuity. The only logical conclusion is that the Petitioners treat every admission as a separate and distinct occurrence requiring a new ADR contract.  Why else would Petitioners continue to present a new contract at each separate admission?

Petitioners attempt to explain away their conduct with the affidavit of Jacqueline Hancock, who was Hillcreek's Director of Admissions in January 2015.  Ms. Hancock, however, has no personal knowledge of the Bramers,[13] but instead only testifies generally as to the admission process. She claims that, as part of her training, she would present a new admissions packet for each admission, but, somehow as Director of Admissions, she would not know if a resident had previously been admitted to the facility or had previously signed an ADR contract. (See DN 15-3, Hancock Affidavit, ¶ 4.) It is unbelievable that a Director of Admissions would not know whether a resident had previously been admitted to the facility or not. It is even more unbelievable that Ms. Hancock would not have known that Mr. Bramer was being readmitted to

---

[12] See DN 17-2.
[13] "I do not remember presenting this particular Alternative Dispute Resolution Agreement to Mr. Bramer." (See DN 15-3, Hancock Affidavit, ¶ 13.) "I don't remember Bramer or his health conditions." (See id., ¶ 16.) "I don't remember how long Bramer was in the building before I presented the admission paperwork to him or how long the admissions process took with him." (See id., ¶ 17.)

the same facility **less than 24 hours** after being discharged.[14] (See DN 13-4.) As such, Ms. Hancock's Affidavit is not persuasive, nor does it overcome Petitioners' repeated conduct and presentation of new ADR contracts at each admission.

Although decided on the grounds of novation, another contract defense, Judge Russell's holding in <u>GGNSC Louisville St .Matthews, LLC v. Badgett</u>, 2017 U.S. Dist. LEXIS 113109 (W.D. Ky. July 20, 2017) (on appeal) is instructive.  There, Badgett was admitted to a GGNSC facility where he signed an arbitration contract.  <u>Id.</u> at *2.  Subsequently, Badgett was discharged from the facility, and later admitted to another GGNSC facility.  <u>Id.</u> at *3.  At the second facility, he was presented with another arbitration contract, which he signed declining arbitration.  <u>Id.</u> at *4.  Following Badgett's death, his Estate brought claims against the second GGNSC facility. <u>Id.</u> at *6.  GGNSC moved to compel arbitration, citing the first arbitration contract.  <u>Id.</u>

Judge Russell correctly held that the Estate's claims against GGNSC could not be compelled to arbitration based on the first arbitration contract.  <u>Id.</u> at *13-14.  Looking to the conduct of the parties, Judge Russell found that the parties were relieved of any obligations under the contract for the first admission.  <u>Id.</u> at *10-11.  In so holding, Judge Russell held that GGNSC, in offering Badgett another arbitration contract to sign, presented him a choice whether or not he wished to arbitrate his claims.  <u>Id.</u> at *11-12.  GGNSC argued that by signing the arbitration contract at the first facility, Badgett agreed to arbitrate any future claims, regardless of whether he was subsequently discharged and readmitted.  <u>Id.</u> at *12.  Judge Russell rejected this argument, stating that,

> if that were indeed the case, then there would be no reason for Petitioners to present Badgett with another arbitration agreement. In other words, under their construction, Petitioners offer Badgett nothing more than an *appearance* of choice.  However, adopting

---

[14] On January 25, 2015, Hillcreek discharged Mr. Bramer to his home. Less than 24 hours later, he had to be readmitted and Ms. Hancock still presented a new arbitration agreement.

> such a construction would cause this Court to run afoul of its
> mandate 'to give effect to every provision and word whenever
> possible.'  Petitioners offer no other reading that would render the
> GLC St. Matthews arbitration agreement more than a mere nullity,
> and at the same time allow them to fall back on the Mt. Holly
> agreement.  By affording Badgett the opportunity to accept or
> reject an arbitration agreement identical to his previous one,
> Petitioners signaled their 'inten[t] to extinguish the old obligation
> by substituting the new one . . . ."  In the end, Petitioners fail to
> adequately explain why two identical documents, presented under
> identical circumstances and ostensibly designed to accomplish an
> identical objective, should nevertheless be treated differently.

Id. at * 12-13 (internal citations omitted).

This Court is faced with a nearly identical situation here, again involving GGNSC.  Upon Mr. Bramer's admission in July 13, 2016, Ms. Bramer was presented with another arbitration contract, which she declined to sign.  (See DN 13-4.)  If the previous arbitration contracts were to remain in effect in perpetuity, as Petitioners claim, there would have been no reason to present Ms. Bramer with yet another arbitration agreement.  To do so was to present Ms. Bramer with nothing more than the *appearance of a choice*.  Ms. Bramer was presented with the opportunity to accept or reject an arbitration contract identical to the previous ones.  The offer to arbitrate was rejected when Ms. Bramer declined to sign and return the agreement.  As in Badgett, Petitioners fail to explain why these identical documents, presented under identical circumstances, should be treated differently.

Petitioners' attempts to distinguish Badgett are not persuasive.  Petitioners argue that because the contract is not ambiguous, the Court may not entertain the parties' conduct.  The Court, however, need not determine that the contract is ambiguous before it applies the contract defense of abandonment.  The abandonment defense does not rely on interpretation of the meaning of the contract, but rather whether the parties act inconsistent with the existence of a contract.  See Texaco, 444 S.W.2d at 263.  Petitioners further argue that the present matter is

13

substantially different because Ms. Bramer did not sign the arbitration contract on the line declining arbitration. Whether Ms. Bramer signed the line declining arbitration, or did not sign the contract at all, the effect is the same. Her conduct is a rejection of the offer to arbitrate, and a lack of mutual assent between the parties. "A manifestation of intention not to accept an offer is a rejection." Restatement (Second) of Contracts § 38.

Petitioners next argue that the arbitration contract in question is "broad," and therefore a presumption of arbitrability should apply. Petitioners' argument, however, ignores the principal that an arbitration contract may be revoked on the same grounds as any other contract. Mt. Holly Nursing Center, 281 S.W.3d at 813. Moreover, Petitioners cite to Huffman v. Hilltop Companies, LLC, 747 F.3d. 391 (6th Cir. 2014) and Nestle Waters North America, Inc. v. Bollman, 505 F.3d 498 (6th Cir. 2007), for the proposition that a previous contract to arbitrate can cover a subsequent dispute. Both cases, however, are distinguishable. First, Nestle is not applicable because it involved the determination of the scope of an arbitration clause "where parties have entered into multiple contracts as part of one overall transaction." Id. at 503. Here, Respondents did not enter into multiple contracts involving one transaction. Instead, the instant case involves three separate transactions, each with a separate arbitration contract. Second, Petitioners cannot rely on Huffman unless they admit that the arbitration contract is ambiguous, which they vehemently deny. In Huffman, the Sixth Circuit Court determined that ambiguity existed as to which clauses of the contract, including the arbitration clause, were subject to the contract's survival clause. 747 F.3d at 397. The court determined that the survival clause did not contain an exhaustive list of which clauses it pertained to, and therefore held that the arbitration clause was intended by the parties to be included in the survival clause though not expressly listed. Id.

14

Regardless of the factual distinctions, neither of these cases stand for the proposition that an arbitration contract is *per se* enforceable to subsequent transactions, as Petitioners suggest. Instead, both cases acknowledge that the federal policy in favor of arbitration is not absolute. Nestle, 505 F.3d at 504.   "[W]e do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated."   Id. (*quoting* EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002)); see also Huffman, 747 F.3d at 396.   Here, the arbitration contract for the Second Admission is not *per se* enforceable on an unrelated transaction 18 months after the contract's execution.   Petitioners' Motion to Compel Arbitration should therefore be denied.

### III.   Even if the Arbitration Contract from the Second Admission Applies to Mr. Bramer's Third Admission, Which it Does Not, It is Not Valid.

If the Court does determine that the Second Admission's purported arbitration contract somehow applies to Mr. Bramer's Third Admission, the arbitration contract from the Second Admission is still not enforceable because it is not valid.   Ms. Bramer never signed the Second Admission's arbitration contract in her capacity as Mr. Bramer's legal representative, and Petitioners did not have proof of her representative capacity at the time of admission, as required by the Admission Agreement.   Nor did the power of attorney that made her Mr. Bramer's attorney-in-fact give her the power to waive Mr. Bramer's constitutional right to a jury trial. Petitioners' Motion to Compel Arbitration related to the Second Admission's arbitration contract should therefore be denied.

### A. Margaret Bramer Did Not Sign the Second Admission's Arbitration Contract in Her Representative Capacity.

Failure to indicate the capacity under which a signature is executed will bind a party to the capacity in which he or she signed the document.   See Kindred Nursing Ctrs. L.P. v. Butler,

2014 Ky. App. Unpub. LEXIS 600 (July 25, 2014); see also Kennedy v. Joy Mfg. Co., 707 S.W.2d 362 (Ky. App. 1986). Petitioners seek to enforce a purported arbitration agreement that neither Mr. Bramer nor anyone with authority for him signed on his behalf. The signature page of the purported arbitration agreement includes a signature line for the resident, a signature line for a facility representative, and a signature line for the legal representative. (See DN 13-4, p. 5.) The signature page also contains a line to specify the legal representative's capacity to sign. (See id.) Mr. Bramer's signature does not appear anywhere on the document. (See id.) Ms. Bramer's signature only appears on the line designated for resident signature. (See id.) Her signature does not designate a legal capacity, nor is it preceded by the words "by" or "for." (See id.) There is no reason for the various signature lines other than to clearly identify the signatories and their capacities to sign.



**THIS AGREEMENT GOVERNS IMPORTANT LEGAL RIGHTS.**
**PLEASE READ IT CAREFULLY AND IN ITS ENTIRETY BEFORE SIGNING.**

_Robert Bramer_      _GLC Hillcreek 100866_
Print Name of Resident      Print Name and Number of LivingCenter

X _Margaret Bramer_      _1/26/15_
Signature of Resident      Date

By my signature, I acknowledge that I have read this Agreement or had it read to me, that I understand what I am signing, and that I accept its terms.

Signature on behalf of LivingCenter: I, _____ (name of LivingCenter witness), do hereby sign this Agreement on behalf of LivingCenter. By my signature, I hereby attest that (1) before Resident and/or Resident's representative signed this document I offered the signer(s) the opportunity to read it in full, or to have it read to him/her in full; (2) I saw the signature of the resident, or of the person signing on behalf of the Resident, written upon this document.

_____      _____
Signature of Resident's Legal Representative      Print Name of Legal Representative

By my signature, I represent that I am a person duly authorized by Resident or by law to execute this Agreement and that I accept its terms.

_____
Specify Capacity of Legal Representative (e.g., Power of Attorney, Agent, Next of Kin)

_____      _____
Address      Phone

16

The Kentucky Court of Appeals addressed this exact issue in <u>Butler</u>, and held that a signature of a family member, absent representative language, does not suffice to bind a nursing home resident to the subject contract (even if that family member had been appointed as an attorney-in-fact for the resident).  2014 Ky. App. Unpub. LEXIS 600.  There, the nursing home resident's son had been appointed as attorney-in-fact for his father six weeks prior to his father's admission to the nursing home.  <u>Id.</u>at *2.  Upon his father's admission at the nursing home, the son signed an optional alternative dispute resolution agreement in his capacity as "son."  <u>Id.</u> at *3.  Following the father's death, the Estate filed an action against Kindred.  <u>Id.</u>  Kindred filed a motion to compel arbitration based on the alleged arbitration agreement.  <u>Id.</u>  The trial court held that the son did not have the authority to sign the arbitration agreement because he signed in his capacity as son even though he was also the attorney-in-fact.  <u>Id.</u> at *4.  The Court of Appeals agreed, holding that

> [i]t is undeniable that a signature of an individual can signify a vast array of legal relationships.  This factor is extremely important for persons given authority under a power of attorney because in that capacity they have actual authority to act for another.

<u>Id.</u> at *11.  The Court of Appeals further stated that Kindred did not establish that when the son signed the agreement Kindred had knowledge that the son had authority to sign as POA, "[n]or does the power of attorney document suggest that any time [the son] signs his name to a document, it is in the capacity as [his father's] attorney-in-fact."  <u>Id.</u> at *11-12.

In another case, also called <u>Kindred Healthcare, Inc. v. Butler</u>, 2014 Ky. App. Unpub. LEXIS 458 (June 20, 2014) ("Butler II"), the Kentucky Court of Appeals again addressed the same issue.  In <u>Butler II</u>, the Court of Appeals affirmed the trial court's holding that a family member did not have the authority to bind his or her loved one to an arbitration agreement because she signed the agreement as "daughter" and not as POA.  <u>Id.</u> at *7-8.

17

Similarly, here, Ms. Bramer, although her husband's attorney-in-fact, did not sign the arbitration contract as her husband's legal representative. Rather than sign the line designated for legal representative, Ms. Bramer signed the line designated "Resident." At no point did she list that she was signing for her husband, or that she was signing as his power of attorney. Accordingly, Ms. Bramer signed only in her individual capacity.[15]

Petitioners counter by arguing that Butler I is an "aberration" and that it distorts the principles of agency law.[16] Petitioners state that "[t]he contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein . . . ." Ford v. Williams, 62 U.S. 287, 289 (1858). While that is true, it is only true to the extent in which the agent is acting on behalf of the principal. If Petitioners' interpretation of agency law were true, then every time an individual who happened to be an attorney-in-fact signed a document, the principal would be bound. That is not what agency law provides. Instead, an agent's acts only binds the principal when the agent is acting in a representative capacity.

Butler I and Butler II are not inconsistent with agency law, as Petitioners suggest. Multiple courts have distinguished between signatures in an individual capacity versus signatures in a representative capacity. For example, Respondents previously cited to Kennedy v. Joy Mfg., Co., 707 S.W.2d 362 (Ky. App. 1986) and Enzweller v. Peoples Deposit Bank of Burlington,

---

[15] Petitioners argue that if Ms. Bramer signed the arbitration contract in her individual capacity, then her loss of consortium claim may be compelled to arbitration. (See DN 19-1, p. 14, fn 12.) Ms. Bramer, however, is not a party to the contract. Parties to the contract include the facility and the resident. (See DN 13-4, p. 2.) Her name does not appear anywhere in the contract, and she was not the resident. Her individual claim cannot be compelled to arbitration then.

[16] Petitioners also argue that Respondents have inappropriately relied on another case involving capacity to sign an arbitration contract, Kindred Nursing Ctrs., L.P. v. Brown, 411 S.W.3d 242 (Ky. App. 2011). (See DN 19-1, p. 14-16.) While Brown involved a different factual scenario, the Court of Appeals determined that the capacity in which one acts is relevant to the effect a representative's actions have. Id. at 247 ("The capacity in which she acted determines the effect that the actions have on any one particular instance or set of circumstances.") Similarly, here, the capacity in which Ms. Bramer acted determines the effect her action in signing the purported arbitration contract has on the enforceability of the contract.

18

<u>Ky.</u>, 742 S.W.2d 569 (Ky. App. 1987).[17]  Petitioners argue that these cases are inapplicable, however, because they involve provisions of the UCC.  Petitioners are incorrect.  While the contract in <u>Kennedy</u> involved a UCC contract, the fact that it was a UCC contract was not the basis for the court's holding that the vice president of the company signed in an individual rather than a representative capacity.  707 S.W.2d at 364.[18]  Regardless of whether the contract was a UCC contract or not, Petitioners have not shown that the UCC somehow differs from agency law.  Additionally, Kentucky courts are required to apply all contracts the same, whether they involve the UCC or forced arbitration.  <u>See</u> <u>Mt. Holly Nursing Center</u>, 281 S.W.3d at 813.

Moreover, the Kentucky Supreme Court has recognized the significance of signing an arbitration agreement in a representative versus individual capacity in <u>Ally Cat, LLC v. Chauvin</u>, 274 S.W.3d 451 (Ky. 2009).  <u>Ally Cat</u> involved a dispute over the validity of an arbitration clause contained in a warranty agreement.  <u>Id.</u> at 453.  The appellant, Dr. Stephanie Russell, who was the sole member of Ally Cat, LLC, signed her name and did not indicate that she was signing on behalf of Ally Cat, LLC.  <u>Id.</u> at 456.  The Court found the agreement inadequate to bind the parties to arbitration.  <u>Id.</u>

Other jurisdictions have also found significance in the capacity in which an arbitration agreement is signed.  In <u>Sager v. Harborside Conn. Ltd. P'ship</u>, 2011 U.S. Dist. LEXIS 72742 (D. Conn. July 7, 2011), the federal court in Connecticut held that an arbitration contract between a nursing home and resident was not enforceable because the power of attorney did not sign as the resident's legal representative, as required by the contract.  <u>Id.</u> at *11.  There, the signature page for the arbitration contract contained signature lines for the resident, as well as, signature lines for the resident's representative to sign in both a representative and individual

---

[17] (<u>See</u> DN 17, p. 10, fn 13.)

[18] The provision of the UCC was relevant to the issue over the adequacy of the consideration in the contact, and not whether the contract was signed in an individual versus representative capacity.  <u>Id.</u>

capacity.  Id. at *5.  The resident's daughter, who was also power of attorney, checked that she was power of attorney on the signature page, and signed the line for the representative to sign in her representative capacity.  Id.  The court held that the arbitration contract expressly required that the representative have actual authority to bind the principal because it contained separate lines for the representative to sign in an individual and representative capacity.  Id. at *10-11. Because the daughter, only signed the line for her individual capacity, she did not sign in her representative capacity, even though she checked she was power of attorney.  Id. at *11. "Lacking these required formalities, the parties did not properly execute the Arbitration Agreement, and Plaintiff is not required to arbitrate this dispute."  Id.

Similarly, in this case, the arbitration contract contained a designated space for Ms. Bramer to sign as representative, and to designate her representative capacity.  (See DN 13-4.) Ms. Bramer did not sign in the space designated for the representative, instead signing on the line designated "Resident."  (Id.)  Nor did she state that she was signing for or on behalf of her husband as his legal representative.  (Id.)  As in Sager, the parties did not execute the arbitration contract according to the formalities of the contract, i.e., signing on the lines created by Petitioners, and it cannot compel Respondents' claims to arbitration.

GGNSC cites to two cases in support of its contention that Butler I is bad law, Pannell v. Shannon, 425 S.W.3d 58 (Ky. 2014) and Holifield v. Beverly Health and Rehabilitation Services, Inc. 2008 U.S. Dist. LEXIS 47909 (W.D. Ky. June 20, 2008).  Both cases, however, are distinguishable from the case at bar.  First, Pannell involved a lease agreement signed by a member of a LLC either in her individual capacity or in her representative capacity for an LLC. 425 S.W.3d at 60.  The Kentucky Supreme Court held that, based on the documentation as a whole, she signed the lease in her representative capacity and the lease bound the company.  Id.

In so holding, the court noted that the contract made it clear that it was a contract on behalf of the LLC because the LLC was specifically named.   Id. at 64.   The court further noted that the signature line was preceded by the word "By," which indicated the signature was in a representative capacity.   Id. (*citing* 7 William Meade Fletcher, *et al.*, Fletcher Cyclopedia of the Law of Private Corporations § 3032 (rev. vol. 2012)).   The court held that because the body of the contract described the corporation or other entity as a party to the contract, then the officer or agent signed the agreement in their representative capacity.   Id. at 65.

Petitioners' comparison to Holifield is also unavailing.   There, Judge Heyburn held that the ADR in question was signed by the resident's sister in her representative capacity, even though she signed on the signature line for "resident."   2008 U.S. Dist. LEXIS 47909 *15.   The court so held because directly above the signature, the ADR stated that

> [t]he undersigned certifies that he/she has read this Arbitration Agreement and that it has been fully explained to him/her, that he/she understands its contents, and has received a copy of the provision and that he/she is the Resident, **or a person authorized by the Resident or otherwise to execute this agreement and accept its terms.**

Id. at *15-16, fn 2.   The court held that, given the language directly above the signature line, the sister's signature on the signature line for resident or representative would be appropriate.

No similar language appears above Ms. Bramer's signature.   (See DN 13-4 and above.) The only language that the signatory is authorized to act on behalf of the resident appears below the signature line for "Signature for Resident's Legal Representative," which is blank.   (See id. and above.)   Unlike in Holifield, Ms. Bramer's signature on the resident line is not appropriate to bind Mr. Bramer absent language that her signature on the resident line was appropriate.[19]

---

[19] Petitioners also cite to a number of cases where the federal courts have enforced arbitration contracts where the legal capacity of the signatory was not specified.   (See DN 19-1, p. 20-21, fn 18.)  Upon review, however, none of

Finally, Petitioners cite to the Kentucky Court of Appeals recent decision in New Oaklawn Investments, LLC, d/b/a Oaklawn Health and Rehabilitation Center v. Stein, No. 2016-CA-001799 (Ky. App. Nov. 9, 2017) as evidence that the Kentucky Court of Appeals has rejected its previous holding in Butler I. The Stein case, however, **did not** overrule Butler I, and is factually distinguishable from the present case. There, the Kentucky Court of Appeals noted that Stein admitted in the proceedings before the trial court that she had executed the arbitration contract on behalf of her mother. Id. at *6. Here, Respondents have never admitted that Ms. Bramer signed the arbitration contract on behalf of her husband. The court also relied on language in the power of attorney itself that provided that persons relying on the power of attorney need not ascertain the authority of the attorney-in-fact. Id. at *6. Here, no such language appears in the power of attorney. In fact, the arbitration contract states it is incorporated into the Admission Agreement upon execution, and **the Admission Agreement specifically states that documentation of the power of attorney must be provided at the time of signature**. (See DN 13-4 and 15-2.) Petitioners can offer zero evidence that Ms. Bramer signed the purported arbitration contract in a representative capacity.

Furthermore, Jacqueline Hancock, the director of admissions in January 2015, admitted that she does not recall Mr. Bramer's two admissions in January 2015. (See DN 15-3, ¶¶ 13, 19.) It is anticipated that Petitioners will counter that although Ms. Hancock did not remember Mr. Bramer's specific admissions, she did attest to her general process for admissions, which included "ask[ing] her relation to the resident and whether she was authorized to act on the resident's behalf." (See id., ¶ 21.) As Petitioners are well aware, however, merely asking someone whether they have the authority to act on behalf of another does not satisfy the creation

---

the cases raised the failure to designate the legal capacity of the signatory as an issue and therefore are not applicable.

of an agency relationship upon which a third party may rely.[20]  Regardless, any statement by Ms. Hancock is mere speculation, as she has already admitted that she does not remember the specific admission process for Mr. Bramer.

Moreover, the Kentucky Supreme Court has held that evidence regarding the general admission process is not sufficient to bind someone to an arbitration agreement in Mt. Holly Nursing Ctr. v. Crowdus, 281 S.W.3d 809, 814 (Ky. App. 2008).  In Crowdus, testimony regarding the nursing facility's general process or what documents it typically presented at the time of a resident's admission was insufficient to bind a resident to arbitration where the nursing home presented no evidence about the admission process for the specific resident in question. Id.  Mere evidence of a company's **habit** or **practice** when presenting arbitration agreements for signature is not evidence of how the nursing home presented an arbitration agreement for signature on a particular occasion.   See id.; see also JP Morgan Chase Bank v. Bluegrass Powerboats, Inc., 424 S.W.3d 902, 909-910 (Ky. 2014).

Like in Crowdus, Ms. Hancock does not and cannot attest to the specific admission process for Mr. Bramer, nor does she describe what information she obtained from Mr. Bramer or Ms. Bramer prior to the signing of the arbitration contract.  Instead, Ms. Hancock only attests to her habit or practice at the time of Mr. Bramer's admissions in January 2015.  According to the Kentucky Supreme Court's ruling in Crowdus, this is **not** sufficient evidence.  Ms. Bramer did not sign in her representative capacity, and Petitioners cannot show otherwise.  The signature

---

[20] An agent has apparent authority only when the principal manifests to a third party that the agent is authorized to act on his or her behalf.  Ping v. Beverly Enters., 376 S.W.3d 581, 594 (Ky. 2012) (citing Mill Street Church of Christ v. Hogan, 795 S.W.3d 263 (Ky. App. 1990); Restatement (Second) of Agency § 27 (1958); Restatement (Third) of Agency § 2.03 (2006)).  Ms. Hancock at no point states that she would have received direction from Mr. Bramer that his wife could act on his behalf, therefore, she cannot attest that Ms. Bramer had apparent authority to act on her husband's behalf.

line for representative is blank.  Petitioners' Motion to Compel Arbitration based on the Second

Admission's arbitration contract should therefore be denied.

### B. Petitioners Failed to Obtain Documentation of the Power of Attorney at the Time of Admission as Required by the Admission Agreement.

The arbitration contract states that upon execution, "this Agreement becomes part of the

Admission Agreement."  (See DN 13-4, ¶ II.)  The signature page of the Admission Agreement

in turn states that, "[c]opies of all documents verifying the status of the Legal Representative

**must be obtained at the time of admission**.  Examples of the required documents include but

are not limited to the following:  **Power of Attorney**, Durable Power of Attorney, Healthcare

Proxy, Guardianship Appointment, Conservator Appointment and others conveying legal

authority."  (See DN 15-2, p. 9.) (emphasis added.)  By the Petitioners' own contractual

language, proof of representative capacity is a condition of the contracts.  Clearly, Petitioners

failed to obtain a copy of Mr. Bramer's Power of Attorney at the time of admission, and even

admit that they did not have the Power of Attorney until the instant action.[21]  (See DN 13, p. 2.)

Such failure is in direct contravention of Petitioners' own contract.

Proof of legal capacity at admission was a condition of the Admission Agreement, and

therefore, the arbitration contract.  "Performance of a duty subject to a condition cannot become

due unless the condition occurs or its non-occurrence is excused."  Restatement (Second) of

Contracts § 225(1).  In Butler I, the Kentucky Court of Appeals took issue with the nursing

facility's failure to obtain the power of attorney document when it accepted the son's signature

as attorney-in-fact.  2014 Ky. App. Unpub. LEXIS 600 at *11 ("Kindred did not establish that

---

[21] There is zero proof that Petitioners were aware of any POA prior to the instant action.  In a footnote and without any proof, Petitioners suggest that they were aware of the POA at the time, but did not have a copy.  (See DN 19-1, p. 22, fn 20.)  The language of the Admission Agreement, however, required Petitioners to obtain a copy of the POA.  (See DN 15-2, p. 9 ("[c]opies of all documents verifying the status of the Legal Representative **must be obtained at the time of admission.**") (emphasis added.).)  They admit that they did not have a copy until this lawsuit.  (See DN 13, p. 2..)

when the arbitration agreement was signed, it operated under the knowledge that Terry had a power of attorney.   If so, it could have asked for him to sign in this capacity.").   Here, Petitioners' failure to obtain documentation of the power of attorney is even more fatal where it is a condition of the Admission Agreement.   Without the required documentation, Petitioners cannot enforce the arbitration contract from the Second Admission.

### C. Margaret Bramer Did Not Have Authority to Sign the January 26, 2015 Arbitration on Behalf of Robert Bramer.

The Second Admission's arbitration contract is also not binding on Respondents because Ms. Bramer did not have the authority to sign the arbitration contract on behalf of her husband. Although Ms. Bramer was the attorney-in-fact for her husband, the power of attorney did not confer to her the power to contract away her husband's constitutional right to a jury trial.

Petitioners rely on three clauses in support of their argument that Ms. Bramer had the power to sign the arbitration contract on behalf of her husband.   First, Petitioners rely on the provision in the power of attorney that Ms. Bramer has the power to "draw, make, and sign any and all checks, contracts, or agreements, and exercise all of my voting rights over assets owned by me."   This provision, however, must be read in context.   "[A]n agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document."   Ping v. Beverly Enters., 376 S.W.3d 581, 592 (Ky. 2012).   The clause specifically refers only to transactions involving assets owned by Mr. Bramer.   Clearly, the arbitration contract is not a contract related to assets owned by Mr. Bramer.   This clause therefore does not confer to Ms. Bramer the power to bind her husband to the arbitration contract.

The second provision relied upon by Petitioners is the power to "institute or defend legal actions concerning me or my property."   Again, this provision does not provide Ms. Bramer with

the power to enter into a pre-suit arbitration agreement.  As the Kentucky Supreme Court has held, the power to institute or defend legal actions does not encompass the power to enter into a pre-dispute arbitration agreement.  See Kindred Nursing Ctrs., L.P. v. Wellner, 2017 Ky. LEXIS 446, *7-8 (Ky. Nov. 2, 2017).

Finally, Petitioners rely on the provision giving Ms. Bramer the power "to do and perform in my name all that I might individually do."  This provision, however, is too broad to give Ms. Bramer the power to waive Mr. Bramer's constitutional rights.[22]  Moreover, when read in context of the remainder of the power of attorney, the provision relates only to financial transactions and property, as those are the only types of transactions enumerated in the power of attorney.  See Ping, 376 S.W.3d at 592.  The power of attorney does not confer to Ms. Bramer the power to sign an arbitration contract and waive her husband's constitutional rights to a trial by jury.  The Motion to Compel Arbitration under the January 26, 2015 contract should therefore be denied.

**IV.   If the Court Does Grant Petitioners' Petition to Compel Arbitration, Respondents' Non-Arbitable Claims Should Not Be Stayed from Proceeding in State Court.**

Assuming, arguendo, that the arbitration contracts are valid and enforceable, Respondents' claims for wrongful death and loss of consortium are not arbitable and should not be stayed from proceeding in state court.[23]  The Anti-Injunction Act, 28 U.S.C. § 2283, states that, "[a] court of the Unites States **may not** grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its

---

[22] Respondents acknowledge that the Supreme Court has reversed the Kentucky Supreme Court's decision regarding the "clear statement rule" in Kindred Nursing Ctrs., L.P. v. Clark, 137 S.Ct. 1421 (2017), and makes this argument for preservation purposes.  Respondents respectfully disagree with the Court's holding that the clear statement rule is hostile to arbitration agreements, and instead it is Respondents' position that the "clear statement rule" would apply equally to any contract in which a principal's constitutional rights are at stake.

[23] (See DN 12, p. 10-13 (discussing how the wrongful death and loss of consortium claims may not be compelled to arbitration).)

jurisdiction, or to protect or effectuate its judgments."  The Act "rests on the fundamental constitutional independence of the States and their courts, and its purpose is to make the dual system of state and federal courts work without needless friction."  Preferred Care of Del., Inc. v. Crocker, 173 F. Supp. 3d 505, 530 (W.D. Ky. 2016) (quoting Zurich Am. Ins. Co. v. Superior Court for State of California, 326 F.3d 816, 824 (7th Circ. 2003)).  "Any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed."  Atl. Coast Line R. Co. v. Bhd. Of Locomotive Engineers, 389 U.S. 281, 294 (1970).

Respondents should not be enjoined from pursuing their claims in state court.  First, as discussed above, the Respondents' claims are not covered under the Second Admission's arbitration contract, nor is the arbitration contract valid.  Second, even if some of Respondents claims are found to be arbitable, Respondents' wrongful death and loss of consortium claims belong to a different group of plaintiffs than the personal injury claims.  See Golden Gate Nat'l Senior Care, LLC v. Hudson, 2017 U.S. Dist. LEXIS 157530 at *14 (W.D. Ky. 2017).  "Thus, enjoining the state court proceedings should not be necessary to protect or effectuate this Court's order requiring [the Estate's] claims to be arbitrated as the court believes that the parties and the state court will likely conform their conduct to the expectations of the law in proceeding with the wrongful death claim."  Id.at *14-15 (internal quotations omitted).  "[T]he state court is in the best position to determine whether it should stay proceedings."  Life Care Ctrs. Of Am., Inc. v. Estate of Neblett, 2015 U.S. Dist. LEXIS 14467 (W.D. Ky. 2015).  If the Court determines that the Estate's claims are subject to arbitration, Respondents should be allowed to move forward with the wrongful death and loss of consortium claims in state court.

## **CONCLUSION**

Petitioners have still not met their burden in showing that a valid arbitration contract exists regarding the July 13, 2016 admission.  The July 13, 2016 arbitration contract is <u>not</u> signed by either Mr. or Ms. Bramer.   Recognizing this, Petitioners originally attempted to apply a purported contract from the First Admission.  When it became clear that argument would not pass muster, Petitioners filed this Motion arguing that the purported contract from the Second Admission is valid and applies. The arbitration contract for the Second Admission, however, does not apply to Mr. Bramer's Third Admission.  The Third Admission, by the plain language of the contract, is not a covered dispute, and any previous arbitration contracts were abandoned when Petitioners presented the Bramers with yet another arbitration contract at the Third Admission.   Even assuming the Second Admission's arbitration contract covers the Third Admission, the contract is not valid because Ms. Bramer did not sign in a representative capacity and did not have the authority to sign the arbitration contract.  Finally, even if the contracts were enforceable, which they are not, Petitioners may not compel Respondents' wrongful death and loss of consortium claims to arbitration, and those claims should not be stayed.  Respondents therefore respectfully request that the Court deny Petitioners Motion to Compel Arbitration.

Additionally, given the exhaustive briefing and number of issues raised by Petitioners, Respondents respectfully request a hearing.

A tendered Order is attached.

Respectfully submitted,

/s/ Jennifer A. Moore
Jennifer A. Moore
Emily A. DeVuono
GROSSMAN & MOORE, PLLC
401 W. Main Street, Suite 1810
Louisville, KY  40202
T:  (502) 657-7100; F:  (502) 657-7111
jmoore@gminjurylaw.com
edevuono@gminjurylaw.com
*Counsel for Respondents*

## CERTIFICATE OF SERVICE

On December 4, 2017, I electronically filed this document through the ECF system, which will send a notice of electronic filing to the following:

Marcia L. Pearson (marcia.pearson@wilsonelser.com)
Edward M. O'Brien (edward.o'brien@wilsonelser.com)
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
100 Mallard Creek Road, Suite 250
Louisville, KY  40207
*Counsel for Petitioners*

/s/ Jennifer A. Moore
*Counsel for Respondents*